474 S.E.2d 906

STATE of West Virginia ex rel. Vennie BLANKENSHIP, Gladys Hensley, Alvis E. Brewer, Carl R. Sigley, Charles McGlone, George R. Nolley, Leonard Mullins, Paul Casto, Dewey Maynard, Glen Adkins, Bacil Gilles, Charles Wolford, Forrest E. Jacobs, Donnie Null, Sr., William J. Ocheltree, Gerald Ullom, Robert Albaugh, Kathleen Lavender, Forrest L. Tennant, John F. Takach, Richard D. Walton and Michael Warden, Petitioners,

v.

Andrew N. RICHARDSON, Workers' Compensation Commissioner, Consolidation Coal Company, Cannelton Industries, and Island Creek Coal Company, Respondents.

No. 23119.

Supreme Court of Appeals of West Virginia.

Submitted March 5, 1996.

Decided July 17, 1996.

Grant Crandall, Crandall, Pyles & Haviland, Charleston, Robert M. Bastress, Jr., Morgantown, Jeffrey V. Mehalic, Segal & Davis, Charleston, Thomas P. Maroney, J. Robert Weaver, Edwin H. Pancake, Charleston, for Petitioners.

Thomas V. Flaherty, Michele Grinberg, Jeffrey M. Wakefield, Andrew B. Cooke, Flaherty, Sensabaugh & Bonasso, Charleston, for Andrew N. Richardson.

John L. McClaugherty, Hoyt E. Glazer, Jackson & Kelly, Charleston, for Consolidation Coal Company, Cannelton Industries, and Island Creek Coal Company, Intervenors, and Amicus Curiae for the West Virginia Business and Industry Council.

Teresa C. Postle, Peter B. Chambers, Charleston, Amicus Curiae for the West Virginia Trial Lawyers Association.

McHUGH, Chief Justice.

Petitioners herein, twenty-two West Virginia workers' compensation claimants, invoke this Court's original jurisdiction pursuant to *W.Va. Const.* Art. VIII, § 3 and *W.Va.Code*, 51–1–3 [1923] and seek a writ of mandamus against respondent Andrew N. Richardson, Commissioner of the Division of Workers' Compensation, Bureau of Employment Programs [1] (hereinafter "Commissioner"). Petitioners challenge the constitutionality of certain provisions of Enrolled Senate Bill 250 (hereinafter "S.B. 250"), which amended the West Virginia Workers' Compensation Act.

The haste with which this comprehensive legislation was enacted is revealed by the sequence of legislative events. S.B. 250 was introduced on February 2, 1995 and received final legislative approval eight days later, on February 10, 1995. The provisions of S.B. 250 became effective on date of passage, the legislature having voted to override the ninety-day waiting period between passage and date of effect. *See W.Va. Const.* Art. VI, § 30 ("[N]o act of the legislature ... shall take effect until the expiration of ninety days after its passage, unless the legislature shall by a vote of two thirds of the members elected to each house ... otherwise direct." *Id.*, in part.) *See also Perry v. Barker,* 169 W.Va. 531, 533 n. 1, 289 S.E.2d 423, 425 n. 1 (1982) (The purpose of the ninety day period "is to provide a sufficient period of time to give notice to the public of the contents of the new law, and to provide government officials sufficient time to perform the duties contemplated by the law.")

## I.

Prior to the introduction and enactment of S.B. 250, the Workers' Compensation Fund (hereinafter "the Fund") was commonly perceived to be in dire financial straits. *See generally* Emily A. Spieler, *Assessing Fairness in Workers' Compensation Reform: A Commentary on the 1995 West Virginia Workers' Compensation Legislation,* 98 W.Va.L.Rev. 23 (1995). Despite the general consensus that the fiscal integrity of the Fund was clearly threatened, there remains considerable debate as to what actually propelled the Fund to its precarious position.

Petitioners maintain that two primary developments in West Virginia contributed most significantly to the Fund's financial fragility. Petitioners first point to the decline in employment in certain industries, such as coal mining, which traditionally have high injury rates and high wages. Quoting Emily A. Spieler, *Social Welfare Policy in the Context of Economic Restructuring: Lessons from the West Virginia Workers' Compensation Programme,* 30 Urban Studies 351, 357–

---

1. The Honorable Gaston Caperton, Governor, Robert C. "Chuck" Chambers, Speaker of the House of Delegates, and Earl Ray Tomblin, Senate President, were originally respondents to this action. However, these parties were dismissed by order of this Court dated January 4, 1996.

58 (1993), petitioners maintain that " '[d]isplaced workers from these industries filed large numbers of claims for disabilities arising from their prior work. During critical years, the premium rates charged to those industries were far too low, resulting in inadequate revenue to the fund. With the decline in payroll in those industries, it is now impossible to fund the cost of those prior injuries with premiums collected from the same industry[.]' " *Id.*

The second development, according to petitioners, was that of " 'political manipulation of the [workers' compensation] programme, particularly an unjustifiable, and probably illegal, decision by the former Governor of West Virginia [Arch Moore] to reduce employers' premium rates below sound financial levels. Effective 1 July 1985, these rates were reduced by 30 percent for every industry, against the advice of the consulting actuarial expert[.]' " *Id.*[2] As a result, petitioners argue, the Fund began losing money " 'on a cash basis, as well as an accrual basis; that is, the revenue collected each year not only failed to fund the future costs of injuries which occurred in that year, but actually was

less than the money that was paid out in that year.' " *Id.* Finally, petitioners maintain that the Fund's past failure to aggressively collect workers' compensation premiums from employers who were in default also contributed to the Fund's financial crisis.

The Commissioner, on the other hand, maintains that the Fund's imminent insolvency is rooted primarily in the legislative and judicial liberalization of permanent total disability (PTD) eligibility, resulting in awards of PTD benefits to West Virginia claimants in numbers far higher than the national average.[3] Liberally conferring these awards, argues the Commissioner, also served as an incentive for claimants with slight medical impairments to apply for lifetime PTD awards instead of returning to work or to a vocational rehabilitation program. *See, e.g., Cardwell v. State Workmens' Compensation Comm'r,* 171 W.Va. 700, 301 S.E.2d 790 (1983). The Commissioner additionally points to the state's poor economy, the failure to provide incentives to employers to encourage safety and accident prevention, the failure of the benefit structure to encourage vocational rehabilitation and return to

**2.** Petitioners and the Commissioner all point out that, in 1989, employers' workers compensation premium rates were raised by 30%. The Commissioner adds that employers' base premiums were subsequently increased by another 30% during the fiscal year ending 1990; by 19% during the fiscal year ending 1991; by 15% during the fiscal year ending 1992; by 8% during fiscal year ending 1993; by 5% during fiscal year ending 1994; and by 12% during fiscal year ending 1995.

**3.** Though the fact that PTD awards have played a significant role in exhausting the Fund's financial resources is not seriously challenged, at least one author questions "the particular comparison which was used to decry high rates of approval of these claims in West Virginia—that 123 awards are made here per 100,000 workers as compared to an average of 7 in other states—[as] not sufficiently credible to provide a reliable comparison." Spieler, *Assessing Fairness in Workers' Compensation Reform, supra* at 53, 58. As one example, Professor Spieler refers specifically to data presented to the compensation programs performance council by researcher Duncan Ballantyne of the Workers' Compensation Research Institute. *Id* at 58 n. 110. Mr. Ballantyne indicated, *inter alia,* that

[t]he national rate of 7 per 100,000 was drawn directly from the annual publication of the

National Council on Compensation Insurance (NCCI) which reports the number of *incurred* claims in a year; that is, the number of injuries and illnesses which occurred in that year that might lead to PTD awards in the future. The rates varied from state to state, but none approached the West Virginia number of 123: Pennsylvania's rate was 23, Kentucky's 21, Virginia's 4; Florida was at the top of the NCCI list at 52 per 100,000 workers. The problem is that West Virginia's rate was based on the number of *awards* made in the same year.... PTD awards are almost always made many years after an injury and the number [of] awards in each year varies based upon a variety of factors, including whether backlogs are being cleared; ... the rate of PTD awards in West Virginia, although always high, varies substantially from one year to the next. Any comparison between incurred and awarded claims is faulty on its face. This comparison is particularly troubling here, since the exposure of the Fund to PTD awards on an incurred basis appears to have peaked in the 1980s. *Id.* (citations omitted; emphasis provided and emphasis added).

work incentives for drawn out litigation within the workers' compensation system, and administrative inefficiencies as having contributed to the Fund's financial difficulties.

■ Though the parties herein differ as to the causes of the Fund's financial plight, they agree that the state of the Fund warranted legislative change. They further agree that it is clearly within the legislature's authority to enact legislation such as S.B. 250,[4] as its power is almost plenary. The legislature's power will not be negated by this Court unless the legislative enactment violates constitutional guarantees. *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 690, 408 S.E.2d 634, 640 (1991) (" 'The Constitution of West Virginia being a restriction of power rather than a grant thereof, the legislature has the authority to enact any measure not inhibited thereby.' Syl. Pt. 1, *Foster v. Cooper,* 155 W.Va. 619, 186 S.E.2d 837 (1972)" [5]; *Lester v. State Workmen's Compensation Com'r,* 161 W.Va. 299, 315, 242 S.E.2d 443, 452 (1978) (the legislature is vested with the authority to modify this State's workers' compensation system as it sees fit so long as no constitutional provision is infringed).

■ Accordingly, when this Court is called upon to determine the constitutionality of a statute, we are guided by the following restraints imposed upon our judicial powers:

' "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. [*W.Va. Const.* Art. V, § 1.] Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt." Syl. Pt. 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965).' Syl. Pt. 2, *West Virginia Public Employees Retirement System v. Dodd,* 183 W.Va. 544, 396 S.E.2d 725 (1990).

Syl. pt. 1, *Lewis, supra. See* syl. pt. 4, *Donley v. Bracken,* 192 W.Va. 383, 452 S.E.2d 699 (1994); syl. pt. 1, *O'Dell v. Town of Gauley Bridge,* 188 W.Va. 596, 425 S.E.2d 551 (1992); syl. pt. 3, *Randall v. Fairmont City Police Dept.,* 186 W.Va. 336, 412 S.E.2d 737 (1991).

■ Thus, this Court is not concerned with the legislative policy which motivated the enactment of S.B. 250, nor do we "sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the legislature to consider facts, establish policy, and embody that policy in legislation." *Boyd v. Merritt,* 177 W.Va. 472, 474, 354 S.E.2d 106, 108 (1986). It is the duty of this Court, however, to determine the constitutionality of the legislation. *Farley v. Graney,* 146 W.Va. 22, 119 S.E.2d 833 (1960).

## II.

■ It has been well established in this jurisdiction that entitlement to the extraordi-

4. As part of the backdrop against which S.B. 250 was enacted, the Commissioner has provided this Court with a rather detailed recitation of workers' compensation legislation enacted in 1990 and 1993. *See, e.g., W.Va.Code,* 23–4–3b [1990] (creation of health care advisory panel); *W.Va. Code,* 21A–3–1 [1993] (creation of compensation programs performance council, the purpose of which is to ensure the effective, efficient and financially stable operation of, *inter alia,* the workers' compensation system). For purposes of this opinion, it is not necessary that we fully reiterate the amendments enacted in 1990 and 1993.

5. "The *Constitution of the United States,* particularly the fourteenth amendment thereto, may also inhibit the legislature from enacting certain legislation." *Lewis,* 185 W.Va. at 690 n. 9, 408 S.E.2d at 640 n. 9. *See Randall v. Fairmont City Police Dept.,* 186 W.Va. 336, 344 n. 11, 412 S.E.2d 737, 745 n. 11 (1991).

nary remedy of mandamus requires three fundamental elements:

'Before this Court may properly issue a writ of mandamus three elements must coexist: (1) the existence of a clear right in the petitioner to the relief sought; (2) the existence of a legal duty on the part of the respondent to do the thing the petitioner seeks to compel; (3) the absence of another adequate remedy at law.' Syllabus Point 3, *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781 (1981).

Syl. pt. 1, *Meadows v. Lewis,* 172 W.Va. 457, 307 S.E.2d 625 (1983). *See also* syl. pt. 3, *Halstead v. Dials,* 182 W.Va. 695, 391 S.E.2d 385 (1990); syl. pt. 1, *Trumka v. Moore,* 180 W.Va. 284, 376 S.E.2d 178 (1988); syl. pt. 1, *W. Va. Citizens Action Group, Inc. v. Daley,* 174 W.Va. 299, 324 S.E.2d 713 (1984); syl. pt. 1, *McMellon v. Adkins,* 171 W.Va. 475, 300 S.E.2d 116 (1983); syl. pt. 1, *Smith v. West Virginia State Bd. of Educ.,* 170 W.Va. 593, 295 S.E.2d 680 (1982); syl. pt. 2, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969).

In their petition to this Court, the petitioners challenge the application of eighteen separate provisions of S.B. 250 to preexisting

workers' compensation claims as unconstitutional violations of the certain remedies clause of *W.Va. Const.* Art. III, § 17, and the due process clause of *W.Va. Const.* Art. III, § 10. In their petition, however, they acknowledge that only ten of these provisions [6] actually affect their particular claims.[7] Moreover, our careful review of the petition reveals that the claim of only one of the twenty-two petitioners had been sufficiently affected by one of the provisions of S.B. 250 at the time the petition was filed to warrant constitutional scrutiny. As noted, mandamus relief cannot be awarded in the absence of the existence of a clear legal right in the petitioner and a clear duty on the part of the respondent to perform the act sought to be compelled. Consequently, we are constrained to address only a limited number of issues presented by the claim of only one of the twenty-two petitioners.

Gerald Ullom, whose work-related injury was sustained in March of 1988, filed his request for reopening for consideration for permanent total disability on February 13, 1995, three days after the passage and effective date of S.B. 250. Petitioner Ullom's request was denied by order dated March 13, 1995 [8] on the grounds he did not meet the

---

**6.** For example, *W.Va.Code,* 23–4–6(d) [1995] (providing, *inter alia,* that PTD benefits shall cease when claimant attains the age necessary to receive federal old age benefits); *W.Va.Code,* 23–4–6(i) [1995] (providing, *inter alia,* that the degree of PPD shall be determined by claimant's degree of whole body impairment); *W.Va.Code,* 23–4–16(a)(2) [1995] (providing, *inter alia,* that a claimant's request for modification, change or reopening of a prior permanent disability award shall be refused if such request is not made within five years of the date of the initial award); *W.Va.Code,* 23–4–16(a)(4) [1995] (providing, *inter alia,* that a claimant's request for modification, change or reopening of a claim be refused where medical or rehabilitation service has not been rendered or durable medical goods or other supplies have not been received for five years).

**7.** Though petitioners challenge eighteen provisions of S.B. 250, they fail to assert that eight of the named provisions actually affect their particular claims, for example, *W.Va.Code,* 23–4–3(a)(4) [1995] (providing that a claimant will be personally liable for the difference between an out-of-state medical provider's fees and the division's schedule for reimbursement of fees if the

medical provider refuses the scheduled fee as payment in full); *W.Va.Code,* 23–4–3(b) [1995] (*inter alia,* requiring claimant, after initial treatment, to obtain medical care from his or her employer's managed care program or health maintenance organization); *W.Va.Code,* 23–4–16(d)(1) [1995] (authorizing, *inter alia,* the division to reopen claims in which PTD benefits have been awarded for reevaluation of the continuing nature of the disability and possible modification of the award.)

**8.** This Court has, in the past, addressed a statute's constitutionality in a mandamus proceeding. *See e.g., Bailey v. Truby,* 174 W.Va. 8, 321 S.E.2d 302 (1984); *Myers v. Barte,* 167 W.Va. 194, 279 S.E.2d 406 (1981); *State ex rel. McCamic v. McCoy,* 166 W.Va. 572, 276 S.E.2d 534 (1981); *State ex rel. West Virginia Housing Development Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969). In the present proceeding, petitioners challenge eighteen provisions of S.B. 250, some of which, as we have indicated, do not relate to any of their claims. Petitioners have further presented to this Court twenty-two claims which not only differ in terms of the type of benefit being sought, but which also are at vary-

requirements of *W.Va.Code*, 23–4–6(n)(1) [1995] in that he had received a total of 32% whole man impairment.[9] *W.Va.Code*, 23–4–6(n)(1) [1995] provides, in relevant part:

Other than for those injuries specified in subdivision (m).[10] of this section, *in order to be eligible to apply for an award of [PTD] benefits for all injuries incurred and all diseases, including occupational pneumoconiosis, with a date of last exposure on and after [February 2, 1995], and for all requests for such an award pending before the division on and after [February 2, 1995], a claimant must have been awarded the sum of fifty percent in prior [PPD] awards or have suffered an occupational injury or disease which results in a finding that the claimant has suffered a* medical impairment of fifty percent. Upon filing such an application, the claim will be reevaluated by the examining board pursuant to subdivision (j) of this section to determine if he or she has suffered a whole body medical impairment of fifty percent or more resulting from either a single occupational injury or occupational disease or a combination of occupational injuries and occupational diseases. A claimant whose prior [PPD] awards total eighty-five percent or more shall also be examined by the board and must be found to have suffered a whole body medical impairment of fifty percent in order for his or her request to be eligible for further review. The examining board shall review the claim as provided in subdivision (j) of this section. *If*

ing procedural stages in the workers' compensation system. This Court would be ill-advised to attempt, in a single, sweeping decision, to address each of petitioners' claims and to determine the constitutionality of so many statutory provisions, the effects of which are not yet known.

Furthermore, in an affidavit submitted to this Court in connection with this proceeding, the Commissioner stated the following:

In response to the 1995 amendments, it is the policy of the Workers' Compensation Division that if all the reports (division's, employer's and claimant's) were received as of February 2, 1995, a claim for [permanent partial disability] or [PTD] should be decided under the old law. These claims are not considered 'pending' but rather are deemed for administrative purposes to be 'submitted.' This policy has been set forth in the *Procedure Manual: A Manual of Procedures for Implementing Workers' Compensation Legislation 1995*. The division has also adopted a policy that if the egregious delay of the division in processing a particular claim, technically would have resulted in consideration of the claim under the new amendments, the claim will also be considered under the old law. Therefore, some of the petitioners are not affected by the 1995 Amendments. In addition, cases pending before the Offices of Judges on February 2, 1995, will be decided under the old law.

Based upon the above, then, some petitioners' claims will not be decided under S.B. 250, but may be decided under the old law. Moreover, the Commissioner has indicated that claims which have been subjected to "egregious delays" by the division will be decided under the old law even if, "technically [such delay] would have resulted in consideration of the claim under the new amendments." This Court cannot predict the precise manner in which the policy expressed above will be implemented and how such implementation will affect petitioners' individual claims. In that context, petitioners' request for relief in mandamus invites this Court to render what would be largely an advisory opinion. However, as we have made clear in the past, in syllabus point 2 of *Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399 (1991): " 'Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes. The pleadings and evidence must present a claim of legal right asserted by one party and denied by the other before jurisdiction of a suit may be taken.' *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of Fairmont*, 126 W.Va. 183, 185–86, 27 S.E.2d 486, 487–88 (1943)." *See also Id.*, 184 W.Va. at 659, 403 S.E.2d at 402 (" '[L]itigants may challenge the constitutionality of a statute *only insofar as it affects them.*' " (footnote and citation omitted) (emphasis added)); *Farley*, 146 W.Va. at 30, 119 S.E.2d at 838. We therefore decline, at this time, to take on the monumental task of deciding the constitutionality of all of the provisions challenged herein and to address all of petitioners' various claims.

9. The total of 32% whole man impairment was based upon one prior award of 32% permanent partial disability (hereinafter "PPD"), claim no. 88–61832.

10. *W.Va.Code*, 23–4–6(m) [1995] provides: "The following permanent disabilities shall be conclusively presumed to be total in character: Loss of both eyes or the sight thereof. Loss of both hands or the use thereof. Loss of both feet or the use thereof. Loss of one hand and one foot or the use thereof."

*the claimant has not suffered whole body medical impairment of at least fifty percent, then the request shall be denied.* Upon a finding that the claimant does have a fifty percent whole body medical impairment, the review of the application shall continue as provided for in the following paragraph of this subdivision [*W. Va.Code,* 23-4-6(n)(2) [1995]].[11] Those claimants whose prior [PPD] awards total eighty-five percent or more and who have been found to have whole body medical impairment of at least fifty percent shall then be entitled to the rebuttable presumption created pursuant to subdivision (d) for the remaining issues in the request.*

(footnotes and emphasis added).

## III.

The denial of Petitioner Ullom's request for reopening for consideration for PTD because he did not suffer a medical impairment of 50% as required by *W.Va.Code,* 23-4-6(n)(1) [1995] warrants our review of that statute in two areas: first, whether *W.Va. Code,* 23-4-6(n)(1) [1995] is constitutional under the equal protection clause, *W.Va. Const.* Art. III, § 10, and, finally, if *W.Va.Code,* 23-4-6(n)(1) [1995] is constitutional, whether its application to Petitioner Ullom's claim violated *W.Va. Const.* Art. III, § 10, the due process clause.

### *Equal Protection*

Petitioners argue that *W.Va.Code,* 23-4-6(n)(1) [1995], which requires, *inter alia,* that

a claimant have a medical impairment of at least fifty percent in order to be considered for a PTD award, violates *W.Va. Const.* Art. III, § 10, the right to equal protection of the law and is, therefore, unconstitutional. *W.Va. Const.* Art. III, § 10, which contains our state's constitutional equal protection principle,[12] provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

▮ This Court has consistently stated that economic legislative classifications are subject to a minimum level of judicial scrutiny, that is, "the traditional equal protection concept that the legislative classification will be upheld if it is reasonably related to the achievement of a legitimate state purpose." *Randall,* 186 W.Va. at 344, 412 S.E.2d at 746. *See Lewis,* 185 W.Va. at 691, 408 S.E.2d at 641. We held in syllabus point two of *Lewis, supra:*

' " 'Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally. Where such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause.' Syllabus Point 7, [as

---

11. A claimant who meets the initial PTD eligibility criteria set forth in *W.Va.Code,* 23-4-6(n)(1) [1995] then obtains review of his or her application for PTD as provided in *W.Va.Code,* 23-4-6(n)(2) [1995], which provides:

A disability which renders the injured employee unable to engage in substantial gainful activity requiring skills or abilities comparable to those of any gainful activity in which he or she has previously engaged with some regularity and over a substantial period of time shall be considered in determining the issue of total disability. In addition, the vocation standards adopted pursuant to [*W.Va.Code,* 21A-3-7(m) ] shall be considered once they are effective. It should be noted that these factors are not statutorily required to be considered when assessing permanent partial disability.

12. In *Gibson v. W. Va. Dept. of Highways,* 185 W.Va. 214, 218-19, 406 S.E.2d 440, 444-45 (1991), we reiterated that "the precise 'phrase "equal protection" is not found in our constitution, [although] its principles are an integral part of our constitutional law.' (citations omitted). . . . '[T]o finally settle where our state's constitutional equal protection principle is located, we hold that it is a part of our Due Process Clause found in Article III, Section 10 of the West Virginia Constitution[.]' " (*quoting Israel v. West Virginia Secondary Schools Activities Commission,* 182 W.Va. 454, 460-61, 388 S.E.2d 480, 486-87.)

modified,] *Atchinson v. Erwin*, [172] W.Va. [8], 302 S.E.2d 78 (1983)." Syllabus Point 4, as modified, *Hartsock–Flesher Candy Co. v. Wheeling Wholesale Grocery Co.*, 174 W.Va. 538, 328 S.E.2d 144 (1984).' Syl. Pt. 4, *Gibson v. West Virginia Department of Highways*, 185 W.Va. 214, 406 S.E.2d 440 (1991).

*See* syl. pt. 4, *Randall, supra;* syl. pt. 2, *O'Dell, supra.*

 Moreover, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Lewis*, 185 W.Va. at 692, 408 S.E.2d at 642 (*citing City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976)). *See Randall*, 186 W.Va. at 345, 412 S.E.2d at 746; *O'Dell*, 188 W.Va. at 603, 425 S.E.2d at 558. *See also Jordan v. State Workmen's Compensation Commissioner*, 165 W.Va. 199, 203, 271 S.E.2d 604, 606 (1980) (If legislation does not impinge on fundamental or constitutional rights, the "State must only demonstrate that the statutory classification bears some rational relationship to a legitimate State purpose.")

Petitioners contend that the legislative classification in *W.Va.Code*, 23–4–6(n)(1) [1995]—claimants whose whole body medical

impairments exceed fifty percent and those whose impairments do not—is not a rational one and does not bear a reasonable relationship to a proper governmental purpose. *See* syl. pt. 2, *Lewis, supra*. Petitioners' argument is derived from *W.Va.Code*, 23–4–6(i) [1995], which forms the foundation for determining PTD eligibility and, ultimately, PTD awards. *W.Va.Code*, 23–4–6(i) [1995] provides:

For the purposes of this chapter, with the exception of those injuries provided for in subdivision (f) of this section and in [*W.Va.Code*, 23–4–6b] *the degree of permanent disability other than [PTD] shall be determined exclusively by the degree of whole body medical impairment that a claimant has suffered.* For those injuries provided for in subdivision (f) of this section and [*W.Va.Code*, 23–4–6b], *the degree of disability shall be determined exclusively by the provisions of said subdivision and said section.* The occupational pneumoconiosis board created pursuant to [*W.Va.Code*, 23–4–8a] shall premise its decisions on the degree of pulmonary function impairment that claimants suffer solely upon whole body medical impairment. *The workers' compensation division shall adopt standards for the evaluation of claimants and the determination of a claimant's degree of whole body medical impairment.*[13] *Once the degree of medical impairment has been determined, that de-*

---

**13.** Pursuant to this legislative directive, the commissioner and the statutorily-created compensation programs performance council adopted 85 CSR 16–1 through 8, with an effective date of February 26, 1996. The purpose of this legislative rule is to implement those statutory provisions "which relate to the development of standards for the rating of permanent whole body medical impairments suffered by claimants as a proximate result of their compensable injuries or diseases." 85 CSR 16–2, in part. *See generally W.Va.Code*, 21A–3–1, *et seq.*

In 85 CSR 16–4.1, "Adoption of Standards," the commissioner adopted the "Guides to the Evaluation of Permanent Impairment," (4th ed. 1993) (hereinafter "Guides"), as published by the American Medical Association. 85 CSR 16–4.1 provides:

Except as provided for in section 6 of this rule, on and after the effective date of this rule all evaluations, examinations, reports, and

opinions with regard to the degree of permanent whole body medical impairment which a claimant has suffered shall be conducted and composed in accordance with the 'Guides to the Evaluation of Permanent Impairment,' (4th ed. 1993) [hereinafter 'Guides'], as published by the American Medical Association. If in any particular claim, the examiner is of the opinion that the Guides or the section 6 substitutes cannot be appropriately applied or that an impairment guide established by a recognized medical speciality group may be more appropriately applied, then the examiner's report must document and explain the basis for that opinion. Deviations from the requirements of the Guides or the section 6 substitutes shall not be the basis for excluding evidence from consideration. Rather, in any such instance such deviations shall be considered in determining the weight that will be given to that evidence. An example of an acceptable recognized medical speciality group's own

gree of impairment shall be the degree of [PPD] that shall be awarded to the claimant. This subdivision shall be applicable to all injuries incurred and diseases with a date of last exposure on or after [February 2, 1995], to all applications for an award of [PPD] that were pending before the division or pending in litigation but not yet submitted for decision on and after such date. The prior provisions of this subdivision shall remain in effect for all other claims.

(emphasis and footnote added).

Petitioners object to the fact that permanent partial disability awards are now, according to *W.Va.Code*, 23–4–6(i) [1995], determined exclusively by the degree of whole body medical impairment, thereby "eliminat[ing] any consideration of the extent to which an individual is 'disabled'—that is, economically affected—by the injury." Spieler, *Assessing Fairness in Workers' Compensation Reform*, supra at 100. *See* n. 10, *supra.* Professor Spieler has explained that it was

estimated that use of medical impairment as the only basis for evaluating permanent [partial] disability would result in a $7.5 million reduction in claims' costs on an annual basis. These savings would presumably result from the elimination of the more subjective process of determining partial disability which had been used previously. In addition, use of a single im-

pairment-rating scheme was designed to increase consistency among medical opinions and, therefore, reduce litigation. [*W.Va.Code*, 23–4–6(i) [1995]], together with other sections of S.B. 250, was intended to limit the need for lawyers in resolution of workers' compensation claims. The impairment-based system would also serve to reduce the number of claimants who would meet any minimum threshold for consideration for a PTD award.

(footnotes omitted). *Id.* at 101–02.

The core of the petitioners' argument is that there is no rational basis for using impairment, rather than disability, as a threshold for determining which claimants will be eligible for permanent total disability review. In this regard, "because specific injuries may affect claimants differently, depending upon a variety of medical and vocational factors, the very consistency and rigidity of an impairment-only system results in a failure to provide appropriate benefits for many claimants.... [T]he impairment-only approach 'presupposes that there is an abstract and uniform measure of 'disability' that is valid and fair for all persons, apart from their activities or occupations.'" *Id.,* at 102 (*quoting* 1C Arthur Larson, *Workmen's Compensation Law,* § 57.14, at 10–97 n. 68 (1995)). In other words, the petitioners assert that it is irrational to disregard a claimant's age, education, intelligence, and work-experience

guides is the 'Orthopaedic Surgeons Manual in Evaluating Permanent Physical Impairment.' *See* 85 CSR 16–3.4 (defining "permanent impairment" and "impairment," according to the Guides, and indicating that "[a] claimant's degree of permanent whole body medical impairment is to be determined in keeping with the determination of whole person permanent impairment as set forth in the Guides." *Id.,* in relevant part.)

The exclusive use of the Guides for evaluation of impairment and, therefore, permanent partial disability, is not recommended by its author:

The critical problem is that no formula is known by which knowledge about a medical condition can. be combined with knowledge about other factors to calculate the percentage by which the employee's industrial use of the body is impaired. Accordingly, each commissioner or hearing official must come to a conclusion on the basis of assessment of the available medical and nonmedical information.

The Guides may help resolve such a situation, but it cannot provide complete and definitive answers. Each administrative or legal system that uses permanent impairment as a basis for disability ratings should define its own means for translating knowledge about an impairment into an estimate of the degree to which the impairment limits the individual's capacity to meet personal, social, occupational, and other demands or to meet statutory requirements. **It must be emphasized and clearly understood that impairment percentages derived according to Guides criteria should not be used to make direct financial awards or direct estimates of disabilities.**
*Id.* at 1/4–1/5 (bold provided).

In light of the AMA's admonition against the exclusive use of its Guides for evaluation of permanent disability, we question the Commissioner's wisdom in adopting them.

in determining whether the claimant's work-related injuries warrant permanent total disability consideration.

The Commissioner's response attempts to place the fifty percent impairment threshold in perspective. He argues that the use of the threshold enhances predictability and is consistent with its use in the determination of permanent partial disability awards, which have generally served as a predicate for permanent total disability determinations. Finally, the Commissioner observes that this heightened threshold is directly related to the legislature's goal in preserving the financial integrity of the Fund.

In conjunction with our analysis of the argument that the fifty percent impairment threshold violates principles of equal protection, three aspects of the new permanent total disability system are worthy of note. First, decisions regarding permanent partial disability have traditionally been impairment-oriented. For example, *W. Va.Code,* 23–4–6(f) [1995] has contained a schedule of permanent partial disability benefits based solely upon the type of injury without regard to the claimant's personal factors. Under the statute, the loss of a foot is a thirty-five percent permanent partial disability whether the claimant is a ballet dancer or an accountant, and the loss of a hand is a fifty percent permanent partial disability whether the claimant is a concert pianist or a television anchor. Second, decisions regarding permanent partial disability may not be accomplished with scientific precision. Inevitably, there has always been a certain degree of uncertainty. For example, *W. Va. Code,* 23–4–6(f) [1995] designates a wide variety of percentages of permanent partial disability for the whole or partial amputation of different appendages, from sixty percent for the loss of an arm to two percent for the loss of one phalanx of any toe other than the great toe. Finally, although the "threshold" for permanent total disability review has been modified, the ultimate decision regarding the "award" of permanent total disability remains intact, that is, under *W. Va.Code,* 23–4–6(n)(2), "a disability which renders the injured employee unable to engage in substantial gainful activity requiring skills or abilities comparable to those of any gainful activity in which he or she has previously engaged with some regularity and over a substantial period of time shall be considered in determining the issue of total· disability."

Though we may believe the legislature's actions are harsh or even cruel, or sound economic policy, its policy decisions, under our constitutional framework, are its own, subjecting it to the scrutiny of the electorate in whose hands the constitution vests the ultimate reviewing authority. As previously noted, we are not constitutionally authorized to superlegislate nor decide the social and economic merits of legislative judgments. *Boyd, supra.* Only when the legislature violates specific constitutional principles can we invalidate legislation. In the exercise of our limited judicial function, we are unable to say that predicating consideration of a claimant's permanent total disability claim on a medical impairment of fifty percent is not rationally related to the legitimate governmental purpose of ensuring the financial integrity of the workers' compensation fund.

As we have previously established, under our rational basis test, "the determination of the group or class to be protected by the statute is *peculiarly a legislative judgment.*" *Gibson,* 185 W.Va. at 220, 406 S.E.2d at 446 (emphasis added). We have further established that

> ' "[t]his inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classification is neither possible nor necessary." '

*Id. (quoting Schweiker v. Wilson,* 450 U.S. 221, 234, 101 S.Ct. 1074, 1083, 67 L.E.2d 186, 198 (1981) and *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520, 525 (1976)). *See also O'Dell,* 188 W.Va. at 603, 425 S.E.2d at 558 (" 'But every line drawn by a legisla-

738

ture leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.'" (*quoting Village of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S.Ct. 1536, 1542, 39 L.Ed.2d 797, 803–04 (1974)); *Robinson v. Charleston Area Medical Center*, 186 W.Va. 720, 729–30, 414 S.E.2d 877, 886–87 (1991) ("'[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. It is enough that the State's action be rationally based and free from invidious discrimination.' (internal citation omitted))" (*quoting Dandridge v. Williams*, 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491, 503 (1970)).

Accordingly, we find that *W.Va. Code*, 23–4–6(n)(1) [1995], which provides that in order to be eligible to apply for an award of permanent total disability benefits, a claimant must have been awarded the sum of fifty percent in prior permanent partial disability awards or have suffered an occupational injury or disease which results in a finding that the claimant has suffered a medical impairment of fifty percent, does not violate *W.Va. Const.* Art. III, § 10, our equal protection clause.

*Due Process*

Having established that *W.Va.Code*, 23–4–6(n)(1) [1995] does not violate equal protection, we must now determine if the application of the statute to petitioner Ullom's case violated his constitutional right to due process. *W.Va. Const.* Art. III, § 10.

Under our due process clause, "*[n]o person shall be deprived of life, liberty, or property, without due process of law*," *W.Va. Const.* Art. III, § 10, in part (emphasis added). We have explained that "[a] 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syl. Pt. 3, *Waite v. Civil Service Commission*, 161 W.Va. 154, 241 S.E.2d 164 (1977).

It is clear that petitioner Ullom, who was injured in 1988 and who subsequently re-

ceived a PPD award of 32%, was entitled to *consideration* for an award of PTD benefits under the workers' compensation law in effect prior to the enactment of S.B. 250. Unlike S.B. 250, the prior law did not require that Petitioner Ullom have a 50% impairment in order to be considered for PTD benefits, but provided:

A disability which renders the injured employee unable to engage in substantial gainful activity requiring skills or abilities comparable to those of any gainful activity in which he or she has previously engaged with some regularity and over a substantial period of time shall be considered in determining the issue of total disability. In addition, the vocational standards adopted pursuant to ... [*W.Va.Code*, 21A–3–7(m) ] shall be considered once they are effective.

*W.Va.Code*, 23–4–6(n) [1994].

Petitioner Ullom would have been, at the very least, afforded the opportunity to be considered for an award of PTD benefits. As we have already pointed out, however, S.B. 250 was introduced on February 2, 1995 and received final legislative approval only eight days later, on February 10, 1995. Moreover, S.B. 250 became effective on date of passage, the legislature having voted to override the 90–day waiting period between passage and date of effect. *See W.Va. Const.* Art. VI, § 30. As a result, Petitioner Ullom's substantive right to be considered for an award for PTD benefits was precluded by the instantaneous enactment of S.B. 250.

Though a workers' compensation statute, or amendment thereto, may be construed to operate retroactively where mere procedure is involved, such a statute or amendment may *not* be so construed where, to do so, would impair a substantive right. *See* syl. pt. 1, *Kosegi v. Pugliese*, 185 W.Va. 384, 407 S.E.2d 388 (1991). *See* syl. pt. 2, *Shifflett v. McLaughlin*, 185 W.Va. 395, 407 S.E.2d 399 (1991); syl. pt. 3, *Maxwell v. State Compensation Director*, 150 W.Va. 123, 144 S.E.2d 493 (1965), *overruled on another point, Sizemore v. State Workmen's Compensation Comm'r*, 159 W.Va. 100, 219 S.E.2d 912 (1975). It is clear that, but for the application of *W.Va.Code*, 23–4–6(n)(1) [1995] to petitioner Ullom's request for reopening for consideration of PTD benefits, his re-

quest would, at the very least, have been considered and that, further, upon proper proof, may have been awarded.

Though due process has been characterized as the " 'least frozen concept of our law—the least confined to history and the most absorptive of powerful social standards of a progressive society[,]' " *Bowman v. Leverette,* 169 W.Va. 589, 597, 289 S.E.2d 435, 440 (1982) (*quoting Griffin v. Illinois,* 351 U.S. 12, 20–21, 76 S.Ct. 585, 591, 100 L.Ed. 891, 900 (1956) (Frankfurter, J., concurring)), it is ultimately measured by the concept of fundamental fairness. *State ex rel. Cogar v. Kidd,* 160 W.Va. 371, 376, 234 S.E.2d 899, 903 (1977). *See State ex rel. Peck v. Goshorn,* 162 W.Va. 420, 422, 249 S.E.2d 765, 766 (1978) ("Due process of law is synonymous with fundamental fairness.") It is no strain upon the purpose of due process protection to conclude that the Legislature may not so narrow the avenues of justice so as to preclude petitioner Ullom's consideration for PTD benefits. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752, 767 (1976) ("The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process[.]"); *State ex rel. Briggs & Stratton Corp. v. Noll,* 100 Wis.2d 650, 302 N.W.2d 487, 491 (1981) (" 'A retrospective statute is unconstitutional if its effect is to deprive a person of life, liberty or property without due process of law.' " (citation omitted)).

■ Accordingly, where a workers' compensation claimant has been previously awarded permanent partial disability benefits that would have entitled the claimant to file for permanent total disability review, legislation that attempts to immediately preclude the claimant's substantive right to seek such review prior to the expiration of the ordinary ninety days provided in *W.Va. Const.* Art. VI, § 30, violates principles of fundamental fairness embodied in the due process provisions of *W.Va. Const.* Art. III, § 10.

Courts will not act to prematurely reach ultimate constitutional issues. Only when an issue is clear should courts decide the constitutional validity of a statute. Claimants, including those petitioners whose claims were not resolved in this opinion, may, upon a sufficient showing, be able to demonstrate in the appropriate forum, that the application of S.B. 250 to his or her particular claim violates his or her constitutional rights.

IV.

In summary, we conclude that *W.Va.Code,* 23–4–6(n)(1) [1995], which provides that in order to be eligible to apply for an award of PTD benefits, a claimant must have been awarded the sum of fifty percent in prior PPD awards or have suffered an occupational injury or disease which results in a finding that the claimant has suffered a medical impairment of fifty percent, does not violate *W.Va. Const.* Art. III, § 10, our equal protection clause.

Additionally, we conclude that it is fundamentally unfair and, therefore, a violation of due process, to apply *W.Va.Code,* 23–4–6(n)(1) [1995] to petitioner Ullom's request for consideration for PTD because he filed such request immediately after the statute's passage and date of enactment.

Writ granted as moulded.